## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

GUIDRY                                  CIVIL ACTION NO. 6:16-cv-1347

VERSUS                                  JUDGE WALTER

U.S. COMMISSIONER,                      MAGISTRATE JUDGE WHITEHURST
SOCIAL SECURITY
ADMINISTRATION


## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

### I. Administrative  Proceedings

The claimant, Connie Francis Guidry, fully exhausted her administrative

remedies prior to filing this action in federal court.  On March 19, 2014, the claimant

filed an application for disability insurance benefits ("DIB") and an application for

supplemental security income benefits ("SSI"), alleging disability.[1]  Her applications

were denied.[2]  The claimant requested a hearing,[3] which was held on December 18,

---

[1]      Rec. Doc. 9-1 (Administrative Transcript), p.13.

[2]      Id.  at 10-31.

[3]      Id.

2014, before Administrative Law Judge Kim A. Fields.[4]  The ALJ issued a decision on February 13, 2015,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act ("the Act") from January 20, 2010 through the date of the decision.  The claimant asked for review of the decision, but the Appeals Council concluded on July 28, 2016, that no basis existed for review of the ALJ's decision.[6]  The ALJ's decision, therefore, became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

## II. Summary of Pertinent Facts

The claimant was born on January 20, 1977[7] and is, therefore, considered a younger person under the Act.[8]  At the time of the ALJ's decision, she was 37 years old.  She graduated from high school and earned vocational school diplomas in drafting and design and in business techology and accounting.[9]  She has past relevant

---

[4]     Id. at 37-66.

[5]     Id.  at 10-31.

[6]     Id. at 1-4.

[7]     Id. at p.52.

[8]     20 C.F.R. § 404.1563.

[9]     R. 9-1, p.53.

work experience as a worker in fast food and grocery stores.[10]  She alleges that she has been disabled since January 20, 2010, due to a neuro cognitive impairment of the frontal lobe due to anoxia at birth, depression and anxiety.[11]

In early 2014, Claimant sought vocational placement assistance from Louisiana Rehabilitation Services ("LRS") to determine appropriate rehabilitation services.[12] On February 8, 2014, Eric R. Cerwonka, Ph.D., conducted a psychological evaluation for Louisiana Rehabilitation Services ("LRS").[13] On the WAIS-IV[14], Ms. Guidry obtained a full scale IQ of 82, which is in the lower end of the low average range. Dr.Cerwonka opined, however, that due to statistically and clinically significant differences in her subtest scores, "Ms. Guidry's ability to use her intelligence is significantly compromised . . ." and that she "functions at a significantly lower level in her cognitive proficiency as compared to her overall Intelligence."[15]

---

[10]    Id..

[11]    Id..

[12]    Id. at 332-337, 339-346, 450-455, 478-492.

[13]    Id. at 332-337.

[14]    Wechsler Adult Intelligence Scale, Fourth Edition.

[15]    R. 9-1, pp. 334-335.

-3-

Cognitive testing revealed that Claimant was mildly impaired and exhibited mild deficits in attention and concentration skills, verbal abstract reasoning, and executive functioning as well as moderate deficits in cognitive flexibility and non-verbal reasoning.[16] Dr. Cerwonka opined that her cognitive deficits would be expected to limit her occupational choices to occupations with less cognitive demand (i.e. requiring quick cognitive flexibility, multi-tasking, or similar challenges).[17]

Personality testing revealed that Claimant suffers from a mental disorder in which distrust is a central feature and which is characterized by a profound alienation and disconnection from others.[18] The results suggest difficulties with emotional closeness, and self-defeating behavior in relationships with others.[19] Dr. Cerwonka opined that Claimant would likely have difficulty with unstructured or unsupervised occupational opportunities.[20]

Dr. Cerwonka's diagnoses included: Unspecified Personality Disorder(provisional), Mild Neurocognitive Disorder (right frontal deficits), and

---

[16]    Id. at 335.

[17]    Id.

[18]    Id at 336.

[19]    Id.

[20]    Id.

Unspecified Depressive Disorder.[21] His conclusion was that she would benefit from rehabilitation services and that "supervised on-the-job training would fit Claimant's needs and abilities at an occupation that allows for supervised independence at a slower-paced work setting."[22] Thereafter, Claimant attended one counseling session with Dr. Cerwonka on September 3, 2014, but failed to show up for any other appointments.[23]

A March 25, 2014 vocational evaluation by T. Scott Smith, Ph.D, indicated that Claimant has significant difficulties with work place communication, including anger outbursts and confrontations with co-workers and supervisors.[24] Consequently, Dr. Smith opined that Claimant should "be placed in a work environment requiring minimal or no co-worker contact or interaction."[25]

Dr. Smith also noted that Claimant's evaluation and testing had to be halted during the first session on March 13, 2014, after approximately two hours because

---

[21]    Id at 337.

[22]    Id.

[23]    The Claimant stated that she agreed to counseling with Dr. Cerwonka "in hopes of working through some of her depression, anxiety and social issues enough to where she may be more employable." Id. 496.

[24]    Id. at 478-480

[25]    Id. 479.

she became frustrated and nervous.[26]  Following a second two-hour meeting on March 14, 2014, Dr. Smith noted that Claimant can maintain composure and be pleasant for up to 1.5–2 hours and that this cognitive and social limitation should be considered when evaluating job placement for Claimant.[27] Dr. Smith concluded that Claimant "would not be able to communicate effectively with others and similarly work with the general public in either educational or employment type of activities."[28]

The Claimant was evaluated by Dr. Naomi Friedberg, Ph.D. at the request of her attorney, for a Mental Status Examination on November 17, 2014.[29] Based on Dr. Friedberg's review of Claimant's records and a clinical interview, Dr. Friedberg's DSM-5 diagnostic impressions were: Persistent Depressive Disorder (Dysthymia) with anxious distress, Avoidant Personality Disorder, and Mild Neurocognitive Disorder with right-frontal deficits due to anoxia at birth (by reported history).[30] Dr. Friedberg opined that Claimant's impairments cause multiple functional limitations that would impede competitive employment, including difficulty with (1) complex

---

[26]    Id. at 481.

[27]    Id.

[28]    Id. at 488.

[29]    Id. at 493-500.

[30]    Id. at 497.

and detailed instructions; (2) engaging in repetitive tasks for two-hour blocks of time with coworkers; (3) sustaining a normal pace over the course of a forty-hour workweek; (4) relating to others; and (5) day-to-day work activity and demands.[31]

On May 7, 2014, Robert McFarlain, Ph.D., a state agency psychological consultant, reviewed the record and opined that Claimant has a mild restriction of activities of daily living, moderate difficulties maintaining social functioning, mild difficulties in maintaining concentration persistence or pace and no episodes of decompensation or extended duration.[32] He specifically noted Claimant is moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors and in the ability to get along with coworkers or peer without distracting them or exhibiting behavioral extremes. [33] He opined that Claimant can perform routine, repetitive tasks and some semi-complex, non-repetitive talks.[34]

At the administrative hearing, clinical psychologist Tommy Stigall, Ph.D., testified that the Claimant has difficulties in interpersonal relationships that would have an adverse effect on her ability to work. He, therefore, suggested that the

---

[31]    Id. at 497.

[32]    Id. at 21.

[33]    Id.

[34]    Id.

Claimant have limited contact with the public, coworkers, and supervisors.[35]  Stigall agreed that Dr. Cerwonka's conclusion that the Claimant's intelligence was "significantly comprised" was consistent with his own report and his recommendation for slower-paced work demands.[36]

The Claimant testified that she was fired by Albertsons in 2010 due to problems with a co-worker and left jobs at Wendy's and Burger King for similar reasons.[37] She testified that she would have difficulty adapting to changes in the work place; learning a new process would slow her productivity.[38] She testified that she has very few social interactions because "I don't understand them. And they don't understand me. It just annoys me, aggravates me."[39]

The vocational expert (VE) testified that an individual limited to medium work with no quotas and no contact with others would not be able to perform any occupations in the economy.[40] Additionally, the need for extra supervision, defined as 15 minutes of direct supervision per hour, or tolerant supervision, defined as

---

[35]     Id. at 38-44.

[36]     Id. 45-46.

[37]     Id. 52.

[38]     Id. 53-54.

[39]     Id. at 55.

[40]     Id. at 61.

tolerant of emotional outbursts due to frustration, would render an individual unemployable.[41]  The VE also testified that "supervised on-the-job training with supervised independence at a slower-paced work setting" was sheltered work and that sheltered work does not constitute work in the competitive economy.[42]

The Claimant now seeks reversal of the Commissioner's adverse decision.

### III. Analysis

**A.    Standard  of  Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[43]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[44]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be

---

[41]    Id.

[42]    Id. at 61-62.

[43]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[44]    *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[45]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[46]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[47]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[48]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[49]

---

[45]     *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[46]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[47]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[48]     *Martinez v. Chater*, 64 F.3d at 174.

[49]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

## B.    Entitlement to Benefits

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[50]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[51]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[52]  A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant

---

[50]    See 42 U.S.C. § 423(a).

[51]    42 U.S.C. § 1382(a)(1) & (2).

[52]    42 U.S.C. § 1382c(a)(3)(A).

-11-

lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[53]

## C.    Evaluation Process and Burden of Proof

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process required the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work at step five.[54]  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[55]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[56] by determining the most the claimant can still

---

[53]      42 U.S.C. § 1382c(a)(3)(B).

[54]      20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[55]      *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[56]      20 C.F.R. § 404.1520(a)(4).

do despite his physical and mental limitations based on all relevant evidence in the record.[57]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[58]

The claimant bears the burden of proof on the first four steps.[59]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[60]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[61]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[57]    20 C.F.R. § 404.1545(a)(1).

[58]    20 C.F.R. § 404.1520(e).

[59]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[60]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[61]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[62]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[63]

**D.    The ALJ's Findings and Conclusions**

In this case, the ALJ determined, at step one, that the Claimant has not engaged in substantial gainful activity since January 20, 2010, her alleged onset date.[64]  This finding is supported by the evidence in the record.

At step two, the ALJ found that the Claimant has the following severe impairments: "anxiety and affective disorder."[65]   This finding is supported by evidence in the record. The claimant challenges this finding.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.[66]

In particular, the ALJ found that the claimant has the residual functional capacity (RFC) to perform medium work except occasionally lift and carry 50

---

[62]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[63]    *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[64]    Rec. Doc. 9-1, p. 15.

[65]    Id.

[66]    Id. at pp. 15-17.

-14-

pounds, frequently lift and carry 25 pounds, unlimited standing and walking, sit for one hour, occasional contact with the general public, co-workers and supervisors, no work involving quotas."[67]

At step four, the ALJ found that the claimant is not capable of performing her past relevant work.[68]

At step five, the ALJ found that the claimant was not disabled from January 20, 2010 (the alleged disability onset date) through February 13, 2015 (the date of the decision) because there are jobs in the national economy that she can perform; laundry classifer, small production assembler, and price marker.[69]  The claimant challenges this finding.

## E.   The Allegations of Error

Claimant Connie Francis Guidry claims that the ALJ erred in: (1) failing to find her Mild Neurocognitive Disorder (right frontal deficits) and/or Personality Disorder severe impairments at step two; (2) failing to support her evaluation of the medical opinion evidence with substantial evidence; and (3) failing to support her RFC assessment with substantial evidence.

---

[67]   Id. at 17.

[68]   Id. at 24.

[69]   Id. at 25-26.

-15-

**F.**   **The Determination by the ALJ**

**1.  ALJ's Finding of Severe Impairments at Step Two**

Claimant contends that while the ALJ found in step two that her anxiety and affective disorder were severe impairments, the ALJ erred in failing to properly evaluate the medical evidence and find that her mild Neurocognitive Disorder and/or Personality Disorder were severe impairments.

In her decision, the ALJ noted that Dr. Cervonka diagnosed Claimant with a "unspecified personality disorder and cognitive disorder" and Dr. Friedberg noted "avoidant personality and mild neurocognitive disorder."[70] She further noted that Dr. Stigall stated that Claimant would not meet Paragraph B or C criteria for 12.02 (neurocognitive disorders), (12.04 affective disorders), (12.06 anxiety-related disorders) or (12.08 personality disorders). [71] Citing Dr. Stigall's findings, the ALJ noted that Claimant is "mildly limited" in daily living activities, has a mild hearing loss, and mild limitations in concentration, persistence and pace.[72] While her intellectual functioning is in "the mild range," Claimant's skills in verbal

---

[70]   Id. at 16.

[71]   Id. at 15.

[72]   Id. at 16.

comprehension and reasoning are in the average range.[73] The ALJ noted that Dr. Stigall opined that Claimant has problems with interpersonal relationships which would have an adverse effect on her ability to work, and therefore, she should have limited contact with the public, co-workers and supervisors.[74]

The ALJ then performed a comparable review of the objective evidence with the Listing of Impairments. The results lead her to conclude that none of Claimant's impairments were severe enough to meet or medically equal one of the impairments listed in Appendix 1, subpart P, Regulations No. 4. In particular, she evaluated 12.02 (neurocogitive disorders) and 12.08 (personality disorders) under four broad functional areas known as the "paragraph B" criteria: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[75] The degree of limitation in each category is based on a five point scale: None, mild, moderate, marked, or extreme. A rating of "none" or "mild" in all four areas will generally result in a conclusion that the impairment is not severe. See 20 C.F.R. § 404.1520a(d)(1). The ALJ opined:

> In activities of daily living, the claimant had mild restriction.  The claimant is able to attend to her personal needs.  She has a pet that she

---

[73]   Id.

[74]   Id.

[75]   Id.

feeds, waters, walks and plays with. She does not require reminds to take care of personal needs or take her medication.  She is able to cook, including grilling meat and making omelets.  She does laundry, housecleaning, mopping and yard work including mowing, edging and using a weed eater.

In social functioning, the claimant had moderate difficulties.  The claimant reported she does not socialize much outside of her family. She stated other people annoy her and she gets aggravated. She does shop.  During psychological testing, she cooperated well with the examiner.   She visits  with others daily.

With regard to concentration, persistence or pace, the claimant had mild difficulties. The claimant watches television and reads.  She is able to follow written and spoken instructions. She was able to maintain concentration to complete psychological testing.

As for episodes of decompensation, the claimant had experienced no episodes of decompensation,[76] which have been of extended duration.[77]

Dr. Cerwonka diagnosed Claimant with Mild Neurocognitive Disorder (right-frontal deficits), unspecified Personality Disorder (provisional) and Unspecified Depressive Disorder. P. 337. Dr. Cerwonka opined, based on psychological testing, "Ms Guidry's ability to use her intelligence is significantly compromised..." and she "functions at a significantly lower lever in her cognitive proficiency as compared to

---

[76]     The SSA updated its mental disability listings in 2017, and replaced the term "episodes of decompensation" with the term "adapt or manage oneself." 20 C.F.R. § 404.1520a(c) (3).

[77]     Id. at 16-17.

her overall intelligence."[78] Dr. Cerwonka further opined that Claimant's actual IQ was closer to the average range but was functionally reduced to low average due to impairment in her ability to process information.[79] As a result he concluded that Claimant should avoid a fast-paced work environment but could perform at an average intellectual level "at a slower-paced job."[80]  He suggested that supervised on-the-job training would fit Claimant's needs and abilities.[81]

Dr. Friedberg opined that Claimant "suffers with right frontal brain deficiencies, depression, anxiety and personality disorder." As a result, she opinied that Claimant has "difficulty with new, unfamiliar tasks, does not respond well to verbal instruction, has difficulty processing quickly and gets agitated easily." [82] She opined that Claimant was likely to have great difficulty sustaining effort at a normal pace over the course of a forty-hour work week.[83]

---

[78]    Id. at 332-337.

[79]    Id. at 335.

[80]    Id.

[81]    Id. at 337.

[82]    Id.  at 496.

[83]    Id. at 497.

Dr. Smith stated that Claimant's "primary disability is Personality Disorder, Cognitive Disorder and difficulty with independent planning. She also has problems with aggression and getting along with others within a work environment.[84] Because she "would not be able to communicate effectively with others and similarly work with the general public,"[85] Dr. Smith opined that Claimant should be "placed in a work environment requiring minimal or no co-worker contact or interaction."[86]

Based on the foregoing, the Court finds that the ALJ fully reviewed the evidence in the record, including Dr. Cerwonka's testing and opinion, and as a result excluded "work involving quotas" from Claimant's residual functional capacity.[87] The ALJ similarly noted Dr. Friedberg's report and her opinion that Claimant should work "alone without coworkers," and thus limited Claimant to no more than occasional contact with others.[88] Thus, the ALJ properly accommodated the documented effects of Plaintiff's mental impairments, including any that were

---

[84]    Id. at 478-479.

[85]`   Id. at 488.

[86]    Id. at 479

[87]    Id. at 17, 19, 23.

[88]    Id. at 17, 19-20.

arguably attributable to her congenital neurocognitive issues or personality disorder, without regard to whether the impairments were recognized as "severe" or not.

To proceed beyond step two, a claimant is only required to prove a single severe impairment. Failure to find a specific impairment severe is generally not grounds for reversal or remand assuming that the ALJ found at least one other impairment to be severe at step two. If, however, the ALJ does not find that that any of the claimant's impairments are severe in isolation, the ALJ is still required to "consider the limiting effects of all [of claimant's] impairments(s), even those that are not severe, in determining [RFC]." 20 C.F.R §§ 404.1545(e); *Social Security Ruling 96–8p*, 1996 WL 374184, at *5; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (The ALJ must "consider the combined effects of all impairments, without regard to whether any such impairment, if considered separately, would be of sufficient severity.").

Accordingly, Plaintiff has shown no harmful error resulting from her claim that her congenital neurocognitive issues or personality disorder were excluded from the ALJ's list of severe impairments. Plaintiff cannot show prejudice because her demonstrated mental limitations were properly reflected in the ALJ's residual functional assessment. p.17-24, *See Jones v. Bowen*, 829 F.2d 524, 526 n.1 (5th Cir.

1987) (rejecting claim of incorrect severity findings as "disingenuous" where ALJ applied the full sequential evaluation process).

## 2. ALJ's Evaluation of the Medical and Vocational Evidence

The ALJ is responsible for determining a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the claimant's ability despite any physical and mental limitations.

This claim was filed before March 27, 2017. Therefore, the medical opinions in the record must be evaluated in accordance with the guidelines set forth in 20 C.F.R. § 404.1527. That statute requires the Commissioner to evaluate every medical opinion received and give a treating physician's opinions controlling weight when they are well-supported and not inconsistent with other substantial evidence in the record. *See Greenspan v. Shalala,* 38 F.3d 232, 237 (5th Cir. 1994); *Jones v. Colvin*, 638 Fed.Appx. 300, 303 (5th Cir. 2016). Even when a treating physician's medical opinions are not given controlling weight, controlling regulations require adjudicators to consider all medical opinions and to explain in the decision the weight assigned to each medical opinion 20 C.F.R. § 404.1527(b); 20 CFR 404.1527(e)(2)(ii).

Here, the ALJ stated that she gave "great weight" to the opinions of the two non-examining psychologists, Robert McFarlain, Ph.D., a state agency psychological consultant, and Dr. Stigall, the testifying medical expert, and that she gave only "some weight" to the opinions of Dr. Cerwonka and Dr. Friedberg, the psychologists who examined the Claimant, and to Dr. Smith, who prepared a vocational report.[89] As none of these experts are the Claimant's "treating physician,"[90] the Court will consider whether the ALJ appropriately considered all of the medical opinions and other evidence in the record, and supported her findings with substantial evidence.

Dr. Cerwonka performed a mental status examination of Claimant. In his Psychological Report, Dr. Cerwonka observed "no signs of untoward anxiety," euthymic mood[91], comprehension was "good," memory, attention and concentration were "fairly good."[92] He noted that Claimant had daily living capabilities, including a driver's license. Dr. Cerwonka noted that her intelligence was average but concluded that Claimant's ability to use her intelligence was significantly

---

[89]    Id. 24.

[90]    Records from Family Center of Acadiana indicate Claimant was periodically seen by Dee Dee Luke, MD from 2009 to 2014. Id. at 355-460.

[91]    "normal, tranquil mental state." Merriam-Webster Medical Dictionary, https://www.merriam-webster.com/medical/euthymia.

[92]    Id. at 333.

compromised, "perhaps due to the ... anoxic birth event."[93] He opined that this compromise causes her to function at a significantly lower lever and suggests that a fast-paced employment setting would be too challenging. Dr. Cerwonka specifically stated, however, that Claimant "would be expected to perform much closer to her actual intellectual level" at "a slower-paced job." Dr. Cerwonka concluded that the results of Claimant's personality testing suggest a "Personality Disorder," "characterized by a profound alienation and disconnection from others." which would "limit some of the [job] opportunities that she may be appropriate for ... especially those that are unstructured or unsupervised."[94]

Dr. Friedberg's report indicates that she performed no mental status examination or other psychological testing of Claimant. Nor does it reflect any clinical evaluation of Claimant's mood, memory or concentration.[95] Rather, based on her review of Dr. Cerwonka's report, Dr. Smith's VOC evaluation, a letter from Claimant's sister and her interview with Claimant, Dr. Friedberg opined that Claimant could not sustain a "normal pace" as her "ability to understand, remember

---

[93]   Id. at 335.

[94]   Id. at 336.

[95]   Id. at 493-497.

-24-

and carry out more complex and detailed instruction would be greatly negatively impacted by her neurocognitive deficits due to reported anoxia at birth."[96]

The foregoing indicates that Dr. Cerwonka's report and opinions were supported by his own thorough evaluation of Claimant. Dr. Friedberg's opinion, however, is not in agreement with the nature or degree of Claimant's impairments as found by Dr. Cerwonka's evaluations and testing. In particular, Dr. Friedberg stated that Claimant would be limited by "the severity and persistent nature of her depression and psychosocial disorders."[97]

Dr. McFarlain reviewed the evidence of record, including Dr. Cerwonka's report, and assessed Plaintiff's mental ability to perform work activities.[98] While the ALJ stated that she gave "great weight" to Dr. McFarlain's opinions, she did not fully adopt his report. Rather, she assessed a restricted ability to interact with the public and co-workers that contradicted Dr. McFarlain's opinion and was in line with Dr. Cerwonka's report and opinion.[99]

---

[96] Id. at 497.

[97] Id.

[98] Id. at 69-72.

[99] Id. at 17, 21, 24, 71.

While Claimant also complains that the ALJ gave "great weight" to Dr. Stigall's testimony regarding his completion of Claimant's Psychiatric Review Technique[100] and the related limitations, Dr. Stigall did not offer an opinion regarding Claimant's mental residual functional capacity.[101] As to Claimant's limitations that would prevent her from working, Dr. Stigall stated that her problems with interpersonal relationships would have an adverse effect on her ability to work. She would require limited contact with the public, co-workers and supervisors.[102]

In summary, Claimant's objection that the ALJ adopted medical opinions from Dr. McFarlain and Dr. Stigall over those from Dr. Cerwonka, Dr. Friedberg and Dr. Smith is inaccurate. The ALJ adopted no specific medical opinion related to Claimant's residual functional capacity. Instead,  the ALJ's RFC determination is supported by substantial evidence including that of Dr. Cerwonka, Dr. Friedberg and Dr. Smith as well as Dr. McFarlain and Dr. Stigall. In arguing that the ALJ's RFC determination is not supported by substantial evidence, Claimant is essentially asking this Court to reweigh the evidence of record. The case law is clear, however,

---

[100]    The Psychiatric Review Technique is used to consider and evaluate the functional consequences of mental impairments relevant to the ability to work—"understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself". *See* 20 CFR §404.1520a(c)(3) .

[101]    Id. at 24, 40-46.

[102]    Id. at 16.

that in applying the substantial evidence standard the court must review the entire record as a whole, but may not reweigh the evidence, try the issues de novo, or substitute its judgment for that of the Commissioner, even if the evidence weighs against the Commissioner's decision. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000). Conflicts in the evidence are for the ALJ to decide and in the instant case, the ALJ resolved such conflicts in favor of the evidence that shows Claimant has the RFC to perform a full range of medium work with certain exertional limitations and more significantly with the following nonexertional limitations: occasional contact with the general public, co-workers and supervisors, no work involving quotas.

### IV. Conclusion and Recommendation

**IT  IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be **AFFIRMED** and this matter dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

-27-

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 18th day of January 2018.

_____
**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**